# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DIAMOND HOUSE OF SE IDAHO, LLC, and TORNKVIST INVESTMENTS, LLC | Case No. 4:18-cv-00383-DCN |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| CITY OF AMMON, | |
| Defendant. | |

## I. INTRODUCTION

The Court has before it a motion for preliminary injunction. The Court has heard oral argument and the motion is at issue. For the reasons stated herein, the Court will GRANT the motion and enjoin the City of Ammon from enforcing Sections 1 and 6 of Ordinance 598 pending trial on the merits.

## II. FACTS[1]

Between 2014 and 2016, the State of Idaho had only 974 licensed foster homes to care for approximately 1,351 foster children. Due in part to a foster parent shortage, the State of Idaho licenses group foster homes, which are residential facilities that provide "group child care for seven (7) but not more than twelve (12) children as an alternative to parental care." IDAPA 16.06.02.003.22. The children who reside at group foster homes

---

[1] Unless otherwise referenced, the following facts are taken from Plaintiffs' Complaint, Dkt. 1.

are in the custody of the State of Idaho. The state designates the organization that operates group foster homes as the children's custodians. Idaho Code § 16-1602(8)).

In March of 2017, Karen Tornkvist ("Tornkvist"), a licensed foster parent and sole manager of Tornkvist Investments, LLC, and Diamond House of SE Idaho, LLC, (collectively referred to hereinafter as "Plaintiffs") purchased 1098 Diamond Circle (hereinafter "Diamond House") in Ammon, Idaho, with the intent to operate it as a group foster home. Diamond House is one of ten large homes in the Oak Ridge subdivision of Ammon ("Diamond Circle homes"), each with six bedrooms and eight bathrooms.

The Diamond Circle homes are located in an R-1 zone, which allows for, among other uses, "one-family detached dwellings and accessory buildings, complying with all requirements of the zone including but not limited to setbacks and open space." Ammon City Code § 10-14-2; 10-12-2(A). The terms "one-family" and "family" are not defined in the Ammon City Code.

To receive a license from the State of Idaho to house foster children at Diamond House, Tornkvist needed to demonstrate Diamond House was in compliance with all applicable city ordinances. On April 17, 2017, Tornkvist called Ammon City Planner Scott Folsom ("Folsom") to ask what she needed to do to operate Diamond House as a group foster home. Although, at the time, Ammon City Code did not expressly require a group foster home to obtain a special use permit to operate in an R-1 zone, Folsom told Tornkvist she should apply for a special use permit. When Tornkvist later asked Folsom for more information, Folsom told her that Diamond House was not zoned for a group foster home (although City Code did not exclude group foster homes from the R-1 zone

at the time), and that the City Council was not accepting any more special use permit applications.

Tornkvist subsequently called Ammon City Attorney Scott Hall ("Hall") to ask what she could do to operate Diamond House as a group foster home. Hall advised Tornkvist to submit an application to Folsom. On October 4, 2017, Tornkvist emailed Folsom an application for a business license for Diamond House. The application listed four homes—Diamond House, plus three identical houses also located in Diamond Circle—Tornkvist intended to buy to operate as group foster homes. On October 17, 2017, Folsom wrote to Tornkvist to reject her application, stating, in part, "[t]he numbers of children that could be housed in the four units you are suggesting would in our opinion change the dynamics of the neighborhood in regard to the number of children and the potential of integrating the children in your care into the neighborhood community." Dkt. 1, ¶ 56.

Tornkvist met with Folsom and Ammon City Mayor Dana Kirkham on November 1 and November 21, 2017, to request reconsideration of Folsom's decision. Tornkvist suggests Folsom told her she should apply to rezone the Diamond Circle buildings to R2-A (a multi-family zone allowing, among other things, townhomes, condominiums, and apartment buildings containing not more than eight units). However, on December 14, 2017, in response to her request for more information on how to petition to rezone the buildings on Diamond Circle to R-2A, Folsom informed Tornkvist by e-mail that "the Diamond Street property has been through multiple hearings for rezone which have been

denied because they were not consistent with the residential zoning in the surrounding neighborhoods." *Id.*, ¶ 73.

Discouraged by Folsom's statement, Tornkvist did not petition to rezone the property, and instead attempted to explore other options. However, unbeknownst to Tornkvist, the Ammon City Council unanimously enacted Ordinance 598 on December 21, 2017, to amend city code to include a new definition for foster family care homes and to restrict group foster homes of any size to the R2-A zone and above. Specifically, Section 1 of Ordinance 598 now defines foster family care homes as, "a location in the City where a minor or minors have been placed in a ward, group home, private home, or any other facility approved as an Idaho State-certified foster caregiver. This term shall not be construed to limit or restrict people within residential zones from serving as foster parents in their own home or residence." Ammon City Code § 10-2-1. Section 6 of Ordinance 598 amended the Ammon City Code to read, in part: "The following uses shall be permitted in the R2-A Residence code. . . Assisted Living Centers, Foster family care homes or Convalescent Homes for not more than twenty (20) residents." Ammon City Code § 10-16-2. The aforementioned code provisions limit group foster homes of any size to the R2-A zone and above. While restricting group foster homes from the R-1 zone, Ordinance 598 did not amend portions of the Ammon City Code which allow day care facilities for up to twelve children to operate in an R-1 zone, or any number of unrelated adults to live together in an R-1 zone. *See*, Ammon City Code §§ 6-3-2(Q), 10-

16-2(B), 10-17-2(B).[2]

On December 5, 2017, Allison Brace of the Intermountain Fair Housing Council (IFHC) wrote a letter to the City on Diamond House's behalf, stating the Fair Housing Act prohibits the City of Ammon from treating foster children differently from biological children. On January 4, 2018, Folsom replied to Brace by letter, stating, in part: "[G]roup homes do not qualify as being protected by 'familial status' under the Fair Housing Act because the employees of the group home are not domiciled at the group home with the minor children over whom they have guardianship." Dkt. 1, ¶ 78, In response, Tornkvist revised her business plan to employ a person as a house parent who would be domiciled at the property with the children and serve as an agent of Diamond House.

On January 10, 2018, Tornkvist emailed Folsom, informing him she had revised her plan to employ a house parent who would be domiciled at the property, and asking him again to reconsider her application. Folsom and Tornkvist exchanged subsequent e-mails about a potential house parent, but, on January 24, 2018, Folsom rejected Tornkvist's request for reconsideration. Folsom retired from the City of Ammon at the beginning of May 2018. On May 10, 2018, counsel from IFHC emailed Folsom's successor, Cindy Donovan, asking her to reconsider Folsom's decision. On May 15, 2018, City Attorney Hall responded that the City would not reconsider Folsom's decision. Because the City of Ammon would not certify that Diamond House complied

---

[2] Ammon City Code does not place a cap on the number of unrelated persons who can live together at any particular residence, unless the residence is an institutional residence such as an assisted living center. Ammon City Code §§ 10-16-2(B); 10-17-2(B).

with its zoning ordinance, the State of Idaho has not approved Diamond House's application to operate as a group foster home. As a result, Tornkvist purchased a substitute property in Idaho Falls on July 6, 2018, with the intent of leasing that property to Diamond House.

Plaintiffs filed the instant suit on August 29, 2018, alleging Ordinance 598 violates the Fair Housing Act and Plaintiffs' right to equal protection of the law under the Fourteenth Amendment. At issue before the Court is Plaintiffs' request for a preliminary injunction enjoining the City of Ammon from enforcing Sections 1 and 6 of Ordinance 598 as facially discriminatory under the Fair Housing Act.

### III. LEGAL STANDARD

Injunctive relief "'is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 1, 22 (2008) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public interest. *Id*. at 20.

Although a plaintiff seeking injunctive relief must satisfy all four of the *Winter* factors, the Ninth Circuit has expressly affirmed a "sliding scale" approach post-*Winter*. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as

the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. (citations omitted).

## IV. ANALYSIS

### A. Type of Injunction Sought

A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and "preserve[s] the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988). A mandatory injunction "orders a responsible party to take action." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996). A mandatory injunction "'goes well beyond simply maintaining the status quo,'" requires a heightened burden of proof, and is "'particularly disfavored.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Anderson v. U.S.*, 612 F.2d 1112, 1114 (9th Cir. 1980)). In general, mandatory injunctions "'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.'" *Id*. (quoting *Anderson*, 612 F.2d at 1115).

The City suggests Plaintiffs seek a "particularly disfavored affirmative or mandatory injunction" because the "effect of Plaintiffs' request would be to rewrite Ammon's ordinance, or direct the City as to the exercise of its legal authority." Dkt. 17, at 19. However, the relevant "status quo" for purposes of an injunction "refers to the legally relevant relationship *between the parties* before the controversy arose." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (emphasis in original); *see also Regents of Univ. of California v. Am. Broad. Companies, Inc.*, 747 F.2d 511, 514

(9th Cir. 1984) (for purposes of injunctive relief, the status quo means "the last uncontested status which preceded the pending controversy") (internal quotation marks and citation omitted).

Here, Plaintiffs contest the enforceability of the City's new ordinance. The status quo before Plaintiffs attempted to license Diamond House as a foster family care home did not bar group foster homes from operating in an R-1 zone. By amending City Code to limit foster family care homes to an R2-A zone, the City of Ammon affirmatively changed the status quo. Further, Plaintiffs challenge Ordinance 598's isolation of foster family care homes to the R2-A zone. The result of an injunction here may be that, under city ordinance, Diamond House could operate as a group foster home. But the requested injunction will not order the City to "take action" and approve Plaintiffs' application. *Marlyn Nutraceuticals, Inc*., 571 F.3d at 879. Like other injunctions that prohibit enforcement of a new law or policy, Plaintiffs' requested injunction is prohibitory, not mandatory. *Arizona Dream Act Coal.*, 757 F.3d at 1061 (injunctions that prohibit enforcement of a new law or policy are prohibitory); *see also Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 732 n. 13 (9th Cir. 1999) (requested preliminary injunction against enforcement of new zoning ordinance was not subject to heightened burden of proof since relief sought was a prohibitory injunction that preserved the status quo pending a decision on the merits).

### B. Subject Matter Jurisdiction

In Response to Plaintiffs' Motion for a Preliminary Injunction, the City primarily challenges the Court's subject matter jurisdiction, contending Plaintiffs lack standing and

fail to satisfy finality or ripeness barriers to jurisdiction. The City suggests Plaintiffs do

not have standing to bring a Fair Housing Act ("FHA") claim because a staffed group

foster home cannot qualify for "familial status" protection under the FHA. The City also

argues Plaintiffs' claims are not ripe because, although Tornkvist engaged in extensive

correspondence with the City regarding licensing Diamond House, Plaintiffs have never

sought, or been denied, the formal approvals necessary to conduct group foster care

operations in Ammon. The City suggests Plaintiffs must obtain a final decision from the

City before they can invoke this Court's jurisdiction to decide their case.

### 1. *Standing*

Whether a claimant has standing is "the threshold question in every federal case,

determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490,

498 (1975). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it

has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or

imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the

challenged action of the defendant; and (3) it is likely, as opposed to merely speculative,

that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v.

Laidlaw Envtl. Services, Inc*., 528 U.S. 167, 180-81 (2000). The party invoking federal

jurisdiction bears the burden of establishing standing. *Lujan v. Def. of Wildlife*, 504 U.S.

555, 561 (1992).

Plaintiffs have shown they have standing to challenge Ordinance 598 because they

have alleged a particularized injury that would be redressed if the Court granted the

requested relief. Plaintiffs allege they own Diamond House, purchased Diamond House

with the intention of using it for a group foster home, developed plans for the group foster home, that Ordinance 598 was subsequently enacted and prohibits use of Diamond House as a group foster home, and that Diamond House cannot receive city or state approval to operate Diamond House as a group foster home as a result. Under these circumstances, Plaintiffs have sufficiently alleged an "injury in fact" that gives them a personal stake in the outcome of the litigation, as Tornkvist's intended use of Diamond House is prohibited by the challenged ordinance. *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 591 (S.D.N.Y. 2013) ("*Tartikov*"); *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1304 (11th Cir. 2006) (holding zoning restriction affecting property use constitutes an injury in fact); *M.J. Entm't Enterprises, Inc. v. City of Mount Vernon, New York*, 234 F. Supp. 2d 306, 310 (S.D.N.Y. 2002) (determining plaintiff had established injury for purposes of standing with respect to one claim, where the challenged ordinance kept the plaintiff from "offer[ing] topless dancing as entertainment at its business establishment").

Plaintiffs' also meet the other elements of Article III standing. Plaintiffs' injury is traceable to the challenged action of the City because Plaintiffs cannot operate a group foster home at its current location as a result of Ordinance 598. *Id.* (holding plaintiff's injury was traceable to the challenged action of a municipality because plaintiff could not engage in its desired use at its current location or relocate to another location due to the

municipality's zoning code).[3] Plaintiffs' alleged injury is redressable through the requested relief because invalidation of the challenged ordinance could allow Diamond House to be used as a group foster home. *Tartikov*, 915 F. Supp. 2d at 591.

However, the City contends Plaintiffs lack standing under the FHA because Plaintiffs fail to show they are protected under, or have been injured by, some application of the FHA's "familial status" requirement. Dkt. 17, at 15. "Familial status" is generally defined under the FHA as (1) one or more minors (2) domiciled with (3) a parent or other person having legal custody of the minor or the designee of a parent or person having legal custody of the minor. 42 U.S.C. § 3602(k). The City argues Plaintiffs cannot qualify for familial status protection as a group foster home without a "foster parent" in residence. Dkt. 17, at 15.

Plaintiffs meet the first element for familial status protection because one or more minors would live at Diamond House. The City challenges the second element because a "person having legal custody" of minors living in Diamond House would not be "domiciled" there. Although the parties dispute whether Tornkvist's intended employment of a house parent to "live" at Diamond House satisfies the "domiciled" requirement, the Court need not reach the issue with respect to standing because Plaintiffs' ability to sue does not rest on the definition of "familial status." "While the FHA uses the definition of 'familial status' to define what constitutes prohibited housing

---

[3] Tornkvist also alleges she has been unable to find any other property located in Ammon that is available for sale, appropriate for use as a group foster home, and located in an R-2A zone, as required under Ordinance 598. Dkt 14-2, ¶ 8.

discrimination, it does not limit standing to persons within the class defined by that term." *Gorski v. Troy*, 929 F.2d 1183, 1188 (7th Cir. 1991). Instead, the FHA provides "an aggrieved person may commence a civil action" in an appropriate court. 42 U.S.C. § 3613(a)(1)(A). The FHA does not define "aggrieved person" in terms of familial status. Instead, an "aggrieved person" includes any person who "(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." *Id*., § 3602(i).

In *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979) and *Trafficante v. Metro. Life Ins. Co*., 409 U.S. 205 (1972), the Supreme Court held standing under the Fair Housing Act extends "to the broadest class of plaintiffs permitted by Art[icle] III." *Gladstone*, 441 U.S. at 96-97 (citing *Trafficante*). The *Gladstone* Court explained that because Congress intended standing under the FHA "to extend to the full limits of Article III, the normal prudential [standing] rules do not apply; as long as the plaintiff suffers actual injury as a result of the defendant's conduct, he is permitted to prove that the rights of another were infringed." *Id*. at 103 n. 9.

In *Gladstone*, a village and five of its residents (one black and four white) challenged racially discriminatory steering practices of real estate brokers. Although neither the village nor the white residents were subject to such discrimination, the Court held they had standing to sue. The village sustained injury as a result of reduced property values and a diminished tax base. *Id*. at 110-11. The white residents sustained injury because they were deprived of the "social and professional benefits" of living in integrated neighborhoods and because of the diminution in the value of their homes. *Id*. at

115. The Court determined such injuries were sufficient to confer standing under the FHA to both the village and the residents to contest the legality of the steering practices at issue. *Id*.; *see also Trafficante*, 409 U.S. at 210 (white individual who contested landlord's racially discriminatory practices directed towards nonwhites suffered injury sufficient to confer standing due to loss of a racially integrated community).

Plaintiffs have similarly alleged injury sufficient to confer standing under the FHA. Plaintiffs contend they were deprived of the right to use Diamond House as a group foster home as a result of the City's amended ordinance. In addition to the loss of housing for potential foster children, Plaintiffs cite their own injury in being unable to provide group foster care for children in need of a home due to a purportedly discriminatory housing ordinance. Plaintiffs thus meet the "aggrieved person" criteria for standing provided in 42 U.S.C. § 3602(i), and have standing under the FHA. 42 U.S.C. §§ 3613(a)(1)(A), 3602(i).

### 2. *Finality and Ripeness*

The City also suggests Plaintiffs' case is not ripe for review in the absence of a formal decision. In support of its claim that Plaintiffs' claim is not ripe, the City submitted fifty pages of emails and letters between the parties to "reveal that the City and Ms. Tornkvist have engaged in substantial, potentially continuing discussions, but that Ms. Tornkvist has never proceeded to the most important step for any proponent of a land use requiring City approval—a formal application to the governing board solely authorized to take legal action on behalf of the City." Dkt. 17, at 4. Because Plaintiffs never sought, nor were denied, formal approval to operate Diamond House as a group

foster home, the City argues Plaintiffs cannot satisfy the ripeness or finality requirements of subject matter jurisdiction.

While the City's contention is accurate with respect to as-applied challenges to a regulation or ordinance, Plaintiffs contest Ordinance 598 as facially discriminatory. Plaintiffs suggest Ordinance 598 is facially discriminatory because the ordinance only affects households where minors are domiciled, and subjects those households to different treatment by restricting them to the R2-A zone. Facial challenges to regulations "are generally ripe the moment the challenged regulation or ordinance is passed[.]" *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n. 10 (1997); *see also Tartikov,* 915 F. Supp. 2d at 595 (facial challenges to the legality of portions of zoning code under the FHA and other statutes were ripe without plaintiffs' participation in the land use process); *Cty. Concrete Corp. v. Township of Roxbury*, 442 F.3d 159, 164 (3d Cir. 2006) (noting the finality requirement does not apply to facial attacks on a zoning ordinance); *Levald, Inc., v. City of Palm Desert*, 998 F.2d 680, 686 (9th Cir. 1993) (final decision requirement does not apply to facial challenges); *Lamar Advert. of Penn, LLC v. Town of Orchard Park, New York*, 356 F.3d 365 (2d Cir. 2004) (holding a party "need not have first sought and been denied *any* permit prior to filing a facial challenge"). (emphasis in original). Plaintiffs' facial challenge to Ordinance 598 is ripe for review and a final decision on Plaintiffs' application to operate Diamond House as a group foster home is not required.

### C. Preliminary Injunction Factors

*1. Success on the Merits*

Plaintiffs invoke two sections of the FHA, 42 U.S.C. §§ 3604(a) and 3604(c), to support their request for an injunction against enforcement of Ordinance 598. Under § 3604(a), it is unlawful to "otherwise make unavailable or deny[] a dwelling to any person because of… familial status[.]"[4] 42 U.S.C. § 3604(a). "Familial status" is completely defined as:

> [O]ne or more individuals (who have not attained the age of 18 years) being domiciled with—
>> (1) a parent or other person having legal custody of such individuals; or
> (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

> The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

42 U.S.C. § 3602(k).

The FHA also prohibits printing any document "that indicates a preference, limitation, or discrimination based on . . . familial status . . . or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c). City ordinances that are discriminatory on their face violate 42 U.S.C. § 3604(c). *Montana Fair Hous., Inc. v. City of Bozeman*, 854 F. Supp. 2d 832, 839 (D. Mont. 2012).

---

[4] "The phrase 'otherwise make unavailable or deny' encompasses a wide array of housing practices, and specifically targets the discriminatory use of zoning laws and restrictive covenants." *Casa Marie, Inc. v. Superior Court of Puerto Rico for Dist. of Arecibo*, 988 F.2d 252, 257 n. 6 (1st Cir. 1993); *see also S. California Hous. Rights Ctr. v. Krug*, 564 F. Supp. 2d 1138, 1150 (C.D. Cal. 2007) (the phrase "'otherwise make unavailable' appears to be as broad as Congress could have made it, and all practices which have the effect of denying dwellings on prohibited grounds are therefore unlawful" (citing *U.S. v. Youritan Constr. Co.*, 370 F. Supp. 643, 648 (N.D. Cal.1973)); *Housing Rights Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1190 (C.D. Cal.2004) ("§ 3604(a) also prohibits actions that make apartments *effectively* unavailable") (emphasis in original).

An ordinance is "facially discriminatory" if it expressly treats members of a protected group differently than others who are similarly situated. *Bangerter v. Orem*, 46 F.3d 1491, 1501 (10th Cir. 1995). "Differential treatment on the face of an ordinance demonstrates an intent to discriminate; additional evidence of discriminatory animus is not required." *Children's Alliance v. City of Bellevue*, 950 F. Supp. 1491, 1495 (W.D. Wash.) (citing *Bangerter*, 46 F.3d at 1500-01).

The Court concludes the classification drawn by Ordinance 598 and the burdens it places on certain Ammon residents renders it discriminatory on its face. Section 1 of Ordinance 598 defines "foster family care home" as "a location within the City where a minor or minors have been placed in a ward, group home, private home, or any other facility approved as an Idaho State-certified foster caregiver." The Ordinance therefore only affects households where children are domiciled. Section 6 of Ordinance 598 limits "foster family care homes" to an R2-A zone. Thus, the law places burdens on homes where minors are domiciled, while any number of unrelated adults are permitted to reside together in an R-1 zone under the City's zoning laws. Ammon City Code §§ 10-16-2(b); 10-17-2(B). Of course, Ordinance 598 does not burden all households with children, but it does not need to apply to all households with children to be facially discriminatory. "That a law may not burden all members of the protected class does not remove its facially discriminatory character. The flip side of this last point is also true: that an ordinance also discriminates against individuals unprotected by the FHA does not eliminate an FHA violation." *Children's Alliance*, 950 F. Supp. at 1496 n. 8 (citations omitted). In addition, even though most households with children are unaffected by

Ordinance 598, the fact that the ordinance does not apply to any households that do not contain children renders it facially discriminatory. *Comty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1049 (9th Cir. 2006) (finding ordinance that excluded women from a homeless shelter was facially discriminatory, even though most women do not live in homeless shelters).

The City relies on *Estavanko v. City of Perry*, 2011 WL 1750232 (M.D. Ga. 2011) and *Keys Youth Svs., Inc. v. City of Olathe*, 248 F.3d 1267 (10th Cir. 2001) to suggest foster children are not a protected class under the FHA. Dkt. 17, at 15-17. Based on a review of the FHA's legislative history, the Court in *Estavanko* concluded:

> There is no evidence that Congress intended the FHA to provide protection for children living in staffed group homes—regardless of whether the staff resides on the premises. On the contrary, the principle statutory construction for this provision is that '*families with children* must be provided the same protections as other classes of persons' protected by the FHA. *See* 54 Fed.Reg. 3236 (Jan. 23, 1989) (emphasis added); *Soules v. Dep't of Hous. & Urban Dev.*, 967 F.2d 817, 821 (2nd Cir. 1992) ('Congress' primary concern [in passing the FHA] was to eliminate direct discrimination against families with children.'). When enacting the familial status provision, Congress was not concerned about the zoning of group homes for children. Rather, Congress amended the FHA to include familial status protection because of the growing concern that '[i]n many parts of the country families with children [were being] refused housing despite their ability to pay for it.' *Eastampton Cntr., L.L.C. v. Twp. of Eastampton*, 155 F. Supp. 2d 102, 116 (D.N.J. 2001) citing H.R. Rep. No. 100-711, at 19 (1988).

*Estavanko*, 2011 WL 1750232, at *6.

In *Keys Youth Services, Inc. v. City of Olathe*, 248 F.3d 1267 (10th Cir. 2001) the Tenth Circuit noted "[t]he FHA does not define 'domiciled,' nor are we aware of a federal or state court that has done so in the 'familial status' context." *Id*. at 1271. The *Keys Youth* Court ultimately determined residential staff were not "domiciled" with

troubled youth living in a group home because "the only proffered reason [such] employees occupy the home is for employment. As a matter of law under these circumstances, we cannot conclude that Keys' employees, collectively or individually, are domiciled at the group home. Thus, the youths cannot be 'domiciled with' them, and Keys' proposed group home therefore cannot qualify for 'familial status' under the FHA."[5] *Id*. at 1272.

Under Idaho law, children who reside at group foster homes are wards of the State in legal custody of the Department of Health and Welfare ("Department"). *See, e.g.*, Idaho Code § 16-1629(8). The Department may place the children of whom it has been given custody in "foster care, shelter care, or other diagnostic, treatment, or care centers or facilities[.]" Idaho Code §16-1629(1). Under *Estavanko* and *Keys Youth*, children who are in the custody of the Department, but who have not yet been placed with foster parents, would only be protected from discrimination if they resided in the same building as agents for the Department. Nor would children be protected if placed in shelter care or other care centers without a custodial adult who also permanently resided in such facilities. However, the FHA provides familial status protection for individuals who are domiciled with "the designee of such parent *or other person* having such custody, with the written permission of such parent *or other person*." 42 U.S.C. § 3602(k)(2) (emphasis

---

[5] *Keys Youth* outlined several "principles of domicile," including the "intent to remain" and "to make a dwelling [a] home." *Id*. at 1272 (citing Restatement (Second) of Conflict of Laws § 18*; Dist. of Columbia v. Murphy*, 314 U.S. 441, 455 (1941) (stating that the "question of domicile" is "to be settled" by reviewing the "*indicia* of where a man's home is")). The Court notes Plaintiffs may qualify for "familial status" protection even under *Keys Youth's* more constrained interpretation of the category if their proposed "house parent" resides exclusively at Diamond House.

added). The Department is a "person" having legal custody of the minors who would live at Diamond House, and Diamond House would be the designee of the Department.[6] *See e.g., Gorski v. Troy*, 929 F.2d 1183, 1187 (7th Cir. 1991) (recognizing the Illinois Department of Child and Family Services was a "person" having custody of a minor, and potential foster parents were its "designees" under the FHA). Thus, it appears the potential residents of Diamond House are entitled to familial status protection under the FHA. *See Children's Alliance*, 950 F. Supp. at 1493, 1495 n. 4 (refusing to reconsider decision that residents of group homes for youth are encompassed by the FHA definition of "familial status" where placement in group homes arose by "court transfer of custody to the State Department of Social and Health Services, court transfer to a licensed child-placement agency, or by written consent of the legal custodian").

A Joint Statement from the Department of Justice and Department of Housing and Urban Development ("HUD") reinforces this interpretation of "familial status." The Joint Statement was issued to provide an overview of the FHA's effect on the ability of local governments to exercise control over group living arrangements. HUD "ordinarily commands considerable deference in interpreting the FHA because HUD is the federal agency primarily assigned to implement and administer" the Act. *Harris v. Itzhaki*, 183

---

[6] The FHA defines a "person" broadly as "one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, receivers, and fiduciaries." 42 U.S.C. § 3602(d). *Estavanko* recognized Georgia's Department of Family and Children Services "may be considered a 'person' having legal custody of children under the FHA." 2011 WL 1750232, at *5. In *Keys Youth*, the Tenth Circuit similarly noted a corporate entity is capable of being the legal custodian of minors under the broad definition of "person" provided in § 3602(d). 248 F.3d at 1271 n. 3.

F.3d 1043, 1051 (9th Cir. 1999) (citation omitted); *see also Gladstone*, 441 U.S. at 107.

With respect to group living arrangements for children, the Joint Statement explains:

> In the course of litigation addressing group homes for persons with disabilities, the issue has arisen whether the [FHA] also provides protections for group living arrangements for children. Such living arrangements are covered by the [FHA's] provisions prohibiting discrimination against families with children. For example, a local government may not enforce a zoning ordinance which treats group living arrangements for children less favorably than it treats a similar group living arrangement for unrelated adults. Thus, an ordinance that defined a group of up to six unrelated adult persons as a family, but specifically disallowed a group living arrangement for six or fewer children, would, on its face, discriminate on the basis of familial status.

Joint Statement of the Dept. of Justice and the Dept. of Housing and Urban Development, *Group Homes, Local Land Use, and the Fair Housing Act*, Aug. 18, 1999.

Where a law is discriminatory against a protected class on its face, the law may only be justified if the restriction benefits the protected class, or if the restriction responds to legitimate safety concerns that are raised by the individuals affected, rather than being based on stereotypes. *Children's Alliance*, 950 F. Supp. at 1497-98 (in claims of discrimination based on familial status, "any asserted benefits of the restrictions must outweigh the burdens, and restrictions cannot rely on stereotypes of children who reside in group homes"); *see also Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 958 (9th Cir. 2010). While the City challenges Diamond House's familial status and notes facial challenges are uniquely disfavored, it nowhere suggests Ordinance 598 benefits foster children living in group homes or that Ordinance 598 responds to legitimate safety concerns. Dkt. 17, at 15-18. In the absence of *any* justification by the City of Ammon for

a facially discriminatory ordinance, Plaintiffs have demonstrated a strong likelihood of success on the merits.

   2.  *Irreparable Harm*

A plaintiff must establish he is likely to suffer irreparable harm in the absence of a preliminary injunction. *Winter*, 555 U.S. at 20. The Ninth Circuit has cautioned that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Services v. Baldrige*, 844 F.2d 668, 674 (9th Cir.1988). As a general rule, a plaintiff seeking injunctive relief must demonstrate that "remedies available at law, such as monetary damages, are inadequate to compensate" for the injury. *Herb Reed Enterprises., LLC v. Florida Entm't Mgmt.*, 736 F.3d 1239, 1249 (9th Cir. 2013).

Plaintiffs suggest they have demonstrated irreparable harm because they have established they are likely to succeed on their FHA claim. Dkt. 14-1, at 6 (citing *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001)). In *Silver Sage*, the Ninth Circuit stated, "[w]e have held that where a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable harm from the fact of defendant's violation." 251 F.3d at 827. The City argues *Silver Sage* is of questionable validity post-*Winter*, and suggests a preliminary injunction relying on a presumption to satisfy any of the four preliminary injunction factors "runs a serious risk of being reversible error." Dkt. 17, at 8-9.

As Plaintiffs note, although *Silver Sage* has been criticized following *Winter*, it has not been overturned, and other courts have continued to recognize violations of civil

rights may create a presumption of irreparable harm. *See, e.g., Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 246 (2d Cir. 2014) (plaintiffs established irreparable harm for purposes of preliminary injunction where local ordinance limited speech in violation of First Amendment); *901 Ernston Road, LLC v. Borough of Sayreville Zoning Bd. of Adjustment*, 2018 WL 2176175, at *5 (D.N.J. 2018) (violation of FHA sufficient to presume irreparable harm); *Step by Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112, 133 (2d Cir. 2016) (noting the Eleventh Circuit "has taken the position that a showing of a substantial likelihood that a defendant has violated the FHA is itself sufficient to create a presumption of irreparable harm, which shifts the burden to defendant to prove that any injury that may occur is not irreparable").

Moreover, the Ninth Circuit has held "that the standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief." *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1175-76 (9th Cir. 2010) (quoting *Silver Sage*, 251 F.3d at 827). Congress recognized housing discrimination creates irreparable injury when it empowered courts to grant injunctive relief for violation of the statute. 42 U.S.C. § 3613(c)(1) ("In a civil action [under the FHA], if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may . . . grant as relief, as the court deems appropriate, any permanent or temporary injunction."). "When evidence shows that the defendants are engaged in, or are about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown." *Burlington N. R.R. Co.*,

934 F.2d at 1074 (*quoting Atchison, Topeka and Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 259-60 (10th Cir. 1981); *see also Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1040 (9th Cir. 2009)).

Finally, Plaintiffs have alleged there are no foster homes available in the City of Ammon to serve as group foster homes as a result of Ordinance 598. If the Court were to deny injunctive relief, the seven to twelve children who could live at Diamond House would be deprived of housing while this case is pending. Given the shortage of foster homes in the State of Idaho, the Court finds Plaintiffs have established irreparable injury for purposes of a preliminary injunction.

### 3. Balance of the Equities

When determining which way the balance of equities tips, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks and citation omitted). The City suggests Plaintiffs have not made a sufficient showing with respect to the balance of equities, but provides almost no evidence that it would be harmed by a preliminary injunction, other than to suggest the "effect of Plaintiffs' request would be to rewrite Ammon's ordinance, or direct the City as to the exercise of its legal authority."[7] Dkt. 17, at 19. However, Plaintiffs' requested injunction is prohibitory and

---

[7] During oral argument, the City for the first time suggested the Ammon Planning Administrator and City Planner could not find any activity in their land use table that would allow the type of group home Tornkvist proposed to operate. The City argues they were accordingly required to pass Ordinance 598 to define "foster family care home" in order for group homes to operate at all in Ammon under the Idaho Supreme Court's holding in *Gardiner v. Boundary Cty. Bd. of Commissioners*, 229 P.3d 369, 372 (Idaho 2010). The City, however, does not explain how, prior to adopting Ordiance 598, any number of unrelated adults could live together and meet the use prescriptions of the R-1 zone while children living in a group

does not direct the City to approve Plaintiffs' application to operate Diamond House as a group foster home. Plaintiffs will still have to go through the City approval process even if the City is temporarily enjoined from enforcing Ordinance 598. Moreover, the City "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Thus, in light of the hardship imposed on Plaintiffs in being unable to find a group home for children in the city of their choice, the balance of equities favors Plaintiffs.

### 4.  *The Public Interest*

In the FHA, Congress declared "it is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Accordingly, courts have emphatically declared the public interest is served by effective enforcement of the FHA. *See, e.g., S. California Hous. Rights Ctr. v. Krug*, 564 F. Supp. 2d 1138, 1145 (C.D. Cal. 2007) (noting that when granting injunctive relief where an FHA violation has occurred, "the public interest in abolishing discrimination dictates that the defendants be held to a continuing standard of fair dealing") (citations omitted); *Gonzalez v. Recht Family P'ship*, 51 F. Supp. 3d 989, 992–93 (S.D. Cal. 2014) (plaintiff met the public interest requirement for preliminary

---

foster home could not. Regardless, the City's land use table is not before the Court, and the parties have not briefed *Gardiner's* application to Ordinance 598. In light of this void, the Court declines to address *Gardiner* for the purposes of the instant order. "At this stage in the proceedings, the Court's task is to assess probabilities—whether Plaintiffs are *likely* to succeed on their claims." *Tenorio-Serrano v. Driscoll*, 324 F.Supp.3d 1053, 1060 (D. Ariz. 2018) (emphasis in original). The Court is not making a final decision on the merits, as that decision must await a more complete record and more thorough briefing. *Id.*

injunction where she established discrimination on the basis of disability because the "public interest has been authoritatively declared by Congress" in its enactment of the FHA) (citation omitted); *see also U.S. v. Commonwealth of Puerto Rico*, 764 F. Supp. 220, 225 (D. Puerto Rico 1991) (emphasizing "the public interest that all citizens have in seeing vigorous enforcement of civil rights legislation like the Fair Housing Act" in concluding that "the public interest weighs heavily in favor of a preliminary injunction").

Contrary to the City's contention, this public policy is important, regardless of the fact that there is no "identified child (or parent) in a present familial relationship" currently impacted by Ordinance 598. Dkt. 17, at 19. Plaintiffs have established Ordinance 598 is facially discriminatory under the FHA. It is clear that the significant public interest in preventing discrimination under the FHA "is an important consideration in the exercise of equitable discretion in the enforcement of statutes." *U.S. v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir.1987). Therefore, in this case, where the FHA authorizes injunctive relief "as the court deems appropriate" to enforce the FHA, 42 U.S.C. § 3613(c)(1), the public interest is served by entry of a preliminary injunction.

## V. CONCLUSION

Plaintiffs have demonstrated a likelihood of success on the merits and of irreparable injury if Ordinance 598 is enforced. Both the balance of equities and the public interest also favor a preliminary injunction. The Court accordingly GRANTS Plaintiffs' Motion.

## VI. ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED:

1. Plaintiff's Motion for a preliminary injunction (Dkt. 14) is **GRANTED**;

2. The City of Ammon is enjoined from enforcing Sections 1 and 6 of Ordinance 598 pending trial on the merits.

DATED: April 5, 2019

David C. Nye
Chief U.S. District Court Judge